J-A20035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DEMETRIOS TSAROUHIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MELANIE CATRICKES | : | No. 604 EDA 2024 |

Appeal from the Order Entered January 26, 2024
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2011-FC-1577

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and DUBOW, J.

MEMORANDUM BY DUBOW, J.:              **FILED OCTOBER 30, 2024**

Appellant, Demetrios Tsarouhis ("Father"), appeals from the January 26, 2024 order entered in the Lehigh County Court of Common Pleas that, *inter alia*, awarded Father shared legal custody and partial physical custody of his 13-year-old triplet daughters, S.T., D.T., and P.T. (collectively, "Daughters"), found Appellee, Melanie Catrickes ("Mother"), to be in contempt of the trial court's orders, and ordered Mother to pay $20,000 in attorney's fees to Father. Father raises challenges to the weight of the evidence with regards to the court's custody determination and further argues that the trial court did not adequately sanction Mother for contempt.  Upon review, we affirm.

In his January 26, 2024 Memorandum Opinion ("Opinion"), the Honorable Thomas M. Caffrey authored a thorough and accurate procedural and factual history in this highly contentious case, which we adopt for purposes of this appeal.  **See** Trial Ct. Op., 1/26/24, at 1-27.  In sum, Mother

and Father were married in 2005, separated in 2011, and divorced in 2018. The separation was prompted by Mother's allegations that Father physically assaulted her in November 2011. Father denies the allegations, but pleaded guilty to Simple Assault on February 23, 2012, and agreed to a protection from abuse order on January 17, 2012.

Mother and Father have four children, including 15-year-old C.T. ("Son") and Daughters (collectively, "Children"). From 2012 to 2019, Mother and Father had shared legal custody, Mother had primary physical custody, and Father had partial physical custody of Children.

In July 2020, Mother filed a petition to modify custody requesting that Son be removed from her home and placed with Father. Mother also abruptly terminated Father's visitation with Daughters. This prompted numerous petitions for modification, contempt, and special relief over the next four years. According to Father, Mother had repeatedly called the police regarding Son from ages 8 to 12 years old, Son is happy in Father's home, and Son would like to participate in therapy and reunify with Daughters and Mother. According to Mother, Daughters disclosed that Father would sneak meat into their food even though they were vegetarians, crack Daughter's knuckles against their will, force them to watch R-rated movies when they were 6 years old, hit Daughters with a belt, lock Daughters in a room, tickle Daughters even though they asked him to stop, put Daughters' fingers up his nose, and made Daughters' sleep in bed with him in his underwear. Father denies most of the allegations, with the exception that he admits that he and Daughters would

all watch movies in his bed when he was dressed appropriately. According to Daughters, Son threatened and physically hurt them when they were living together, including threatening to kill them in their sleep, pulling their hair, punching and kicking them, calling them names and teasing them, not letting them in his room, and turning off lights to scare them. Father and Son deny these claims. Father and Son would both like to have contact with Daughters.

In December 2020, the trial court appointed Ronald Esteve, Ph.D., to conduct a custody evaluation. Mother did not fully cooperate. Dr. Esteve was not able to produce a complete evaluation, but recommended reunification and co-parent therapy, prompting the court to order Mother to cooperate. In December 2021, the court appointed Otto Psychological Associates to provide reunification and co-parent therapy to the family. In February 2021, the court issued an interim custody order granting Father: sole legal and primary physical custody of Son and partial custody of Daughters. The court granted Mother: sole legal and primary custody of Daughters, and partial physical custody of Son. The parties continued to file numerous petitions. In March 2023, the court ordered Otto Psychological Associates to commence reunification therapy.

In June 2023, the court appointed guardian *ad litem* ("GAL") for Children. Mother initially refused to cooperate with the GAL, coached the Daughters, and secretly recorded the meetings between Daughters and the GAL. Mother also allowed Daughters to read the GAL's reports.

The court held hearings on June 22, 2023, July 10, 2023, July 17, 2023, August 14, 2023, September 14, 2023, October 5, 2023, October 30, 2023, and December 14, 2023, to resolve numerous outstanding petitions for modification, contempt, and special relief.

On January 26, 2024, after considering the 23 Pa.C.S. § 5328 custody factors and the best interest of Children, the trial court entered a custody order, which awarded: 1) Parents shared legal custody of Children; 2) Father primary physical custody of Son; 3) Mother supervised physical custody of Son every other Saturday from 12:00 PM to 6:00 PM for six months supervised by a family therapy provider, then after six months partial physical custody of Son every other weekend with Daughters present; 4) Mother primary physical custody of Daughters; and 5) Father supervised physical custody of Daughters every other Saturday from 12:00 PM to 6:00 PM for six months supervised by a family therapy provider, then after six months partial physical custody of Daughters every other weekend with Son present. The court also ordered Mother and Father to enroll in co-parenting counseling and individual therapy, Children to continue or enroll in individual therapy, and everyone to participate in intense family therapy.

On the same day, the court found Father in contempt on two of Mother's contempt petitions and ordered him to pay an aggregate fine of $500. In turn, the court found Mother in contempt on five on Father's contempt petitions, which arose from Mother's refusal to permit Father to visit Daughters, as well as her ongoing refusal to participate in court-ordered co-parenting or

reunification therapy. The court ordered Mother to pay $20,000 in attorney's fees to Father.

Father timely appealed. Both Father and the trial court complied with Rule 1925.

Father raises the following issues[1] for our review:

1. The trial court erred as a matter of law and abused its discretion when it did not give sufficient weight to the testimony and recommendations of the [GAL] that [Children] should be placed in Father's custody as they are being traumatized while living with Mother.

2. The trial court erred as a matter of law and abused its discretion when it did not give sufficient weight to the testimony and recommendations of the court-appointed expert, Dr. Ronald Esteve, Ph.D., who performed a custody evaluation, that [Children] should be placed in Father's custody as they are being currently traumatized while living with Mother.

3. The trial court erred as a matter of law and abused its discretion in not awarding Father sole legal custody and sole physical custody of [Children] despite the trial court concluding that Mother was actively trying to turn [Children] against Father.

4. The trial court erred as a matter of law and abused its discretion in not awarding Father sole legal custody and sole physical custody despite the trial court concluding that there were numerous occasions where Mother failed to cooperate with regard to the co-parenting and reunification process.

_____

[1] In the statement of questions section of his brief to this Court, Father raises a sole issue for our review: "Did the trial court commit an error of law and abuse its discretion by denying Father's request for sole legal custody and sole physical custody of Children?" Father's Br. at 13. However, Father divides his argument section into seven subsections with issue subheadings, all of which he preserved in his Rule 1925(b) statement. Accordingly, we will address each of the issues Father's raises in his argument section.

5. The trial court erred as a matter of law and abused its discretion in not awarding Father sole legal and sole physical custody of [Children] despite the trial court concluding that there were numerous occasions where Mother violated the court orders

6. The trial court erred as a matter of law and abused its discretion in not awarding Father sole legal custody and sole physical custody of [Children] despite the trial court concluding that Father was clearly the parent that is more likely to encourage and permit frequent and continuing contact between [Children] and Mother.

7. The trial court erred as a matter of law and abused its discretion in failing to adequately sanction Mother for her contemptuous conduct in violation of the court's orders pursuant to 23 Pa.C.S.[] § 5323(g).

Appellant's Br. at 27, 32, 35, 41, 46, 55, 57 (some capitalization omitted).

## A.

This Court reviews a custody determination for an abuse of discretion and our scope of review is broad. *S.W.D. v. S.A.R.*, 96 A.3d 396, 400 (Pa. Super. 2014). This Court will not find an abuse of discretion "merely because a reviewing court would have reached a different conclusion." *In re K.D.*, 144 A.3d 145, 151 (Pa. Super. 2016). We must accept the findings of the trial court that the evidence supports. *S.W.D.*, 96 A.3d at 400. Importantly, "[o]n issues of credibility and weight of the evidence, we defer to the findings of the trial judge who has had the opportunity to observe the proceedings and demeanor of the witnesses." *K.T. v. L.S.*, 118 A.3d 1136, 1159 (Pa. Super. 2015) (citation omitted). We can interfere only where the "custody order is manifestly unreasonable as shown by the evidence of record." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). Further, in a custody case, relief is not warranted unless the party claiming error suffered

prejudice from the mistake. *J.C. v. K.C.*, 179 A.3d 1124, 1129-30 (Pa. Super. 2018).

When reviewing child custody matters, our "paramount concern and the polestar of our analysis" is the best interests of the child. *Saintz*, 902 A.2d at 512 (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well-being." *D.K.D. v. A.L.C.*, 141 A.3d 566, 572 (Pa. Super. 2016) (citations omitted). "Common sense dictates that trial courts should strive, all other things being equal, to assure that a child maintains a healthy relationship with both of his or her parents, and that the parents work together to raise their child." *S.C.B. v. J.S.B.*, 218 A.3d 905, 916 (Pa. Super. 2019).

The trial court "shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors . . . which affect the safety of the child," including the seventeen factors mandated by the Custody Act. 23 Pa.C.S. § 5328(a). The court must "delineate the reasons for its decision[.]" *Id.* at § 5323(d). Finally, in any action regarding the custody of the child between the parents of the child, there shall be no presumption that custody should be awarded to a particular parent and no preference based upon gender. 23 Pa.C.S. §§ 5327(a) and 5328(b).

**B.**

Father's first six claims raise challenges to the weight of the evidence and fail to garner him relief. In accordance with our well settled standard of review, we defer to the trial court on issues of weight and credibility. The Honorable Thomas M. Caffrey has authored a comprehensive, thorough, and well-reasoned Opinion, including discussion of relevant law, and has engaged in an analysis of each of the Section 5328 custody factors and made specific findings regarding each factor, which the record supports. Trial Ct. Op. at 27-45. After a thorough review of the parties' briefs, the applicable law, and the trial court's Opinion, we conclude that there is no merit to the issues that Father has raised on appeal and, thus, discern no abuse of discretion. Accordingly, we adopt the trial court's analysis as our own and affirm on the basis of the trial court's January 26, 2024 Opinion. *Id.* at 1-45 (relaying a thorough factual and procedural history, providing an accurate summary of the evidence, considering all of the Section 5328 custody factors, and finding that it was in Daughters' best interest to award Father shared legal custody and partial physical custody, and specifically ordering therapeutic visitation with Father for a period of six-months).

**D.**

In his last issue, Father avers that the trial court abused its discretion when it failed to adequately sanction Mother after finding her in contempt of the court's orders. Father's Br. at 57. Father argues that the trial court should not only have imposed fines and attorney fees, but also should have

imprisoned Mother for her contemptuous conduct and granted him sole physical custody of Daughters. *Id.* at 60-61.

We review a contempt order for a "clear abuse of discretion." *Chrysczanavicz v. Chrysczanavicz*, 796 A.2d 366, 368 (Pa. Super. 2002) (citation omitted). We give great deference to the trial court's findings. *Id.* Our review is, thus, "confined to a determination of whether the facts support the trial court's decision." *Id.* at 368-69 (citation omitted). Section 5323 provides that failure to comply with a custody order resulting in contempt is punishable by "any one or more" of the following: imprisonment, a fine, probation, an order for "nonrenewal, suspension or denial of" a driver's license, or counsel fees and costs. 23 Pa.C.S. § 5323(g)(1).

Instantly, the trial court found that Mother's conduct "constituted an egregious interference on her part with Father's custodial rights. Therefore, Mother is adjudged in contempt and shall pay Father $20,000.00 in attorney's fees within 180 days of the entry of the Custody Order." Trial Ct. Op. at 49. Upon review, we conclude that the court properly exercised its discretion in ordering Mother to pay $20,000 in attorney's fees, relief that is cognizable under Section 5323, as the sole sanction for her conduct. As explained above, we give great deference to the trial court, and we find no abuse of discretion as the record supports the trial court's findings.

**E.**

In sum, the trial court did not err when it entered the January 6, 2024 custody order after considering the Section 5328 custody factors. Father's

challenges to the weight of the evidence fail to garner him relief. Moreover, the trial court ordered a permitted sanction for Mother's contemptuous conduct and the record supports the court's findings. Accordingly, we find no abuse of discretion.

All parties are instructed to attach a copy of the January 26, 2024 trial court Opinion to all future filings.

Order affirmed.

President Judge Lazarus joins the memorandum.

President Judge Emeritus Panella joins the memorandum and files a concurring statement in which President Judge Lazarus joins.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/30/2024

## IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
### CIVIL DIVISION

DEMETRIOS TSAROUHIS,                    :    NO.: 2011-FC-1577
             Plaintiff              :
                                  :    CUSTODY
       vs.                              :
                                  :    ASSIGNED JUDGE:
MELANIE CATRICKES f/k/a                 :    Judge Thomas M. Caffrey
MELANIE TSAROUHIS,                      :
             Defendant              :

### MEMORANDUM OPINION

#### I.    OVERVIEW

Plaintiff Demetrios Tsarouhis ("Father") and Defendant Melanie Catrickes ("Mother") were married on October 2, 2005. The Parties divorced from the bonds of matrimony on May 18, 2019. The Parties are the parents of a son, C.T., born August 20, 2008, and three daughters, S.T, D.T., and P.T., all born July 7, 2010 (S.T., D.T., and P.T. are collectively referred to as "Daughters").

An event integral to the present custody case occurred on November 23, 2011, when, according to Mother, Father physically assaulted her. Father was charged with simple assault (misdemeanor of the second degree), and, on February 23, 2012, entered a guilty plea to the charge of simple assault by mutual combat (misdemeanor of the third degree). In addition, Mother obtained a temporary PFA Order against Father, and, on January 17, 2012, a final PFA Order was entered by agreement of the Parties. Mother subsequently filed two separate indirect criminal contempt complaints against Father, but both were dismissed.

The Parties separated on a permanent basis following the November 23, 2011, incident. Father initiated custody proceedings and an order was eventually entered whereby the Parties

shared legal custody of the Children, Mother exercised primary physical custody, and Father had periods of partial physical custody.

Between 2012 and 2019, there were only minor changes made to the custodial schedule. However, the Parties' relationship deteriorated in 2019, resulting in the filing of various petitions for relief by both Parties.

The Parties relationship deteriorated even further in 2020. On June 3, 2020, Mother filed a Petition for Contempt. In July 2020, Mother requested that C.T. be removed from her home and placed with Father, and Mother abruptly terminated Father's visitation with Daughters. These events precipitated the filing of a multitude of petitions and counterclaims over the next four years by both Parties. Many of these petitions and counterclaims have not been resolved.[1]

The following pleadings were filed between July 2020 and December 2020:

- On July 16, 2020, Mother filed an Amended Petition for Contempt. Father filed an Answer and Counterclaim for Contempt.

- On July 16, 2020, Mother filed a Petition for Modification. On July 28, 2020, Father filed an Answer and Counterclaim.

- On July 16, 2020, Mother filed a Petition for a Court Appointed Expert Evaluation of C.T. On July 28, 2020, Father filed an Answer, and on November 11, 2020, filed an Amended Answer.

- On August 11, 2020, Mother filed an Emergency Petition for Special Relief. On August 17, 2020, Father filed an Answer. On August 27, 2020, Father filed an Amended Answer and Counterclaim for Contempt.

---

[1] Although the Parties have engaged in extensive litigation over the years, the Court considers the relevant time period to have commenced in June 2020 with the filing of Mother's Petition for Contempt. Judge Edward D. Reibman presided over this case until December 31, 2021. The case was then assigned to the undersigned judge, effective January 1, 2022.

- On September 4, 2020, Father filed an Emergency Petition for Special Relief.

- On September 11, 2020, Mother filed a Petition for Emergency Relief.

- On November 11, 2020, Father filed an Emergency Petition for Special Relief.

The Court determined that a custody evaluation was required, and, on December 22, 2020, entered an Order directing the Parties to select an evaluator to conduct the custody evaluation. However, the Parties agreed to have the Court select the evaluator. On January 20, 2021, the Court appointed Ronald Esteve, Ph.D. to conduct the custody evaluation.

On December 21, 2020, the Court entered an Interim Order denying Mother's Emergency Petition for Special Relief, filed August 11, 2020, and granting in part Father's two Emergency Petitions for Special Relief, filed September 4, 2020, and November 11, 2020, respectively.

On January 6, 2021, Father filed an Emergency Petition for Special Relief and Petition for Contempt alleging that Mother violated the December 21, 2020, Order by preventing Father from contacting Daughters and isolating Daughters from he and his family.

The Court entered an Interim Order on February 22, 2021, granting Father sole legal custody and primary physical custody of C.T., Mother partial physical custody of C.T., Mother sole legal custody and primary physical custody of Daughters, and Father partial physical custody of Daughters. On February 24, 2021, Father filed an Emergency Petition for Special Relief. The Court entered an Order on March 8, 2021, staying the custodial schedule pending the completion of the custody evaluation.

On June 13, 2021, Dr. Esteve issued his Report.[2] Dr. Esteve made several points that are worth noting:

---

[2] Exhibit D-4.

3

- At the beginning of the evaluative process, Mother made herself easy to contact and readily available. Father, on the other hand, pressed Dr. Esteves to expedite the process. However, the Parties switched roles toward the end of the process. Father became more flexible, while Mother became more rigid and defensive during the psychological testing phase of the evaluation.

- During Father's meeting with Daughters, Father expressed great frustration and impatience with Daughters' apprehension surrounding him. Although Father could see that his behavior caused Daughters a great deal of distress, he continued to criticize Mother in front of Daughters. Father also accused Daughters of lying if they said something with which he disagreed.

- Father believed that Mother actively damaged and disrupted the healthy relationship he had with Daughters. However, Father had difficulty self-critiquing; instead, he placed the blame solely on Mother for his issues with Daughters.

- Some of Daughters' reports regarding Father's behavior were concerning. However, Dr. Esteve was unable to get the complete picture, as he did not have the opportunity for each child to meet with Father.

- During the Parties' communications regarding C.T., Father was quick to point the finger at Mother's failure instead of figuring out what truly went wrong.

- Mother expressed concern about how Father's abuse of her in front of the Children might have affected the Children, particularly C.T. While Mother was "quiet, thoughtful, and logical" in her recollections, it is at this point that Mother first revealed her inability to self-critique or accept any responsibility for this

4

chronic conflict. Mother remained focused on her concern over Father's erratic and aggressive behavior and the clear decline of C.T.

- Father initially appeared to acknowledge that abuse took place, but seemed to suggest it happened so long ago that it was attenuated from the current situation. Throughout the interview process, Father seemed to disclaim that the abuse happened more and more. When Father did acknowledge that abuse had occurred, he described it as merely an event that happened in the past, not as something he did to Mother. In effect, Father continued to refuse responsibility for his actions, even if he admitted that abuse occurred in their relationship.

- During C.T.'s interview with Mother, C.T., in his effort to be loyal to Father, had no choice but to reject Mother. This occurred throughout the interview, even when Mother and C.T. were reminiscing about good times that they shared together.

- C.T. was very critical, angry, and disapproving of Mother and her actions regarding custody. At times, C.T.'s opinion of Mother reflected Father's viewpoint of her. Mother met C.T.'s criticism by expressing that she loved him and wanted the best for him.

- Daughters doted on Mother and perceived her as their protector.

- Daughters had a loving relationship with Father at one point, but Daughters report and description of Father's physical abuse was concerning and at times disturbing.

- When asked to describe Father, P.T. described him as "tall and scary," and commented that his presence made her feel uncomfortable. S.T. questioned

5

Father's intentions and claimed to be afraid of him, while D.T. shared that Father frightened her.

- Daughters were bright and personable, but when Father was in their presence, they all seemed to shut down.

- During the group meeting with Father and Daughters, Father was often dismissive and impatient. However, during the individual meetings, there were noticeable changes in Father as he interacted with each Daughter separately. He was more patient and receptive to their opinions. Each Daughter reacted differently during the individual meeting, as D.T. and P.T. refused to interact with Father (but he still attempted to converse with them), while S.T. was receptive to conversing with Father.

- D.T. and P.T. 's reaction to Father was disproportionate based on the circumstances of the meeting, even considering their history. Dr. Esteve thought it was concerning how intractable Daughters' position was regarding Father, and hypothesized the estrangement between Father and Daughters will likely make this situation worse.

- Dr. Esteve recommended that the Parties participate in therapy; that the Children participate in therapy; that the Parties participate in co-parent counseling; and that the Parties and the Children participate in family reunification therapy.

6

After receiving Dr. Esteve's report, the Court became aware that Mother had failed to complete psychological testing and produce each Daughter for separate meetings with Dr. Esteve and Father. Therefore, on July 27, 2021, the Court entered an Order scheduling a hearing "to afford Mother the opportunity to explain why she has apparently not participated fully with Dr. Esteve and thereby compromising the value of his report."

On August 4, 2021, Father filed a Petition for Modification seeking shared physical custody of the Children, and a Petition for Contempt alleging that Mother violated the January 20, 2021, Order by failing to cooperate with Dr. Esteve's evaluation. On August 19, 2021 Mother filed an Answer alleging that although she encouraged Daughters to participate in the custody evaluation, Daughters refused to meet with Dr. Esteve.

On August 30, 2021, the Court entered an Order providing that the Parties and the Children must follow the requests of Dr. Esteve in order to complete the custody evaluation, both Parties are responsible for the costs of the custody evaluation, and the Parties are to follow the Interim Order of March 8 2021.

After Mother's psychological evaluation was completed and Daughters had met with Dr. Esteve and Father, Dr. Esteve issued an Addendum on November 7, 2021.[3]

On December 17, 2021, the Court entered an Interim Order granting Father sole legal custody and primary physical custody of C.T., Mother partial physical custody of C.T., Mother sole legal custody and primary physical custody of Daughters, and Father partial physical custody of Daughters. In addition, the Parties were directed to attend therapy, attend co-parenting counseling, enroll the Children in therapy, participate in reunification therapy, and allow the Children to contract each Party. The footnote to the Order provides in relevant part: "Of primary

---

[3] Exhibit D-5.

7

urgency is getting the parents to put aside their history and focus on ensuring that going forward each child has a full relationship with the other parent and with each of their siblings, the recommendations of the therapist/counselor will be critical in those regards and must be followed."

On December 30, 2021, the Court entered an Interim Order appointing Otto Psychological Associates for the purpose of providing co-parenting counseling and reunification therapy.

On May 19, 2022, the Court held a hearing for the purpose of hearing Dr. Esteve's expert testimony regarding the results of his custody evaluation. On July 26, 2022, the Court held a hearing for the purpose of interviewing the Children.

On January 13, 2023, Mother filed a Petition for Contempt alleging that Father violated the December 17, 2021, Interim Order by failing to inform her that C.T. was no longer attending therapy and by disparaging Mother when communicating with her. On March 1, 2023, Father filed an Answer and Counterclaim for Contempt alleging that Mother placed Daughters on medication without his consent, travelled with Daughters without informing Father, failed to notify Father when the Daughters were involved in an automobile accident, and permitted her paramour to participate in medical decisions for Daughters.

On April 21, 2023, the Court, upon agreement of the Parties, entered an Interim Order reflecting the same terms as the December 30, 2021, Interim Order, with additional provisions regarding Mother's participation in reunification therapy with C.T., notice of change in residence, and school enrollment.[4]

After receiving a letter from Dr. Otto recommending that reunification therapy be commenced, the Court held a Conference on March 20, 2023, attended by counsel for the Parties. Upon agreement of counsel, the Court entered an Order on March 30, 2023, authorizing Otto

---

[4] The Interim Order partially resolved the Parties' Petitions for Contempt.

8

Psychological Associates to commence reunification therapy in accordance with the Interim Orders entered December 17, 2021, and December 30, 2021.

Following the entry of the Order directing the Parties to commence reunification therapy, Mother discharged her attorney and thereafter proceeded as a self-represented litigant. In addition, Mother retained the services of the organization known as "The Foundation for Child Victims of the Family Courts" (hereinafter "Foundation"). The Executive Director of the Foundation is purported to be Ms. Jill Jones Soderman.

On May 18, 2023, Father filed a Petition for Modification and an Emergency Petition for Interim Special Relief. Father sought sole legal and physical custody of Daughters on an emergency basis, alleging that Mother had failed to cooperate with reunification therapy.[5] Mother filed a Response alleging, among other things, that reunification therapy is not appropriate in view of the facts of this case.

In addition to the hearings the Court held on May 19, 2022, and July 26, 2022, the Court, in response to the round of pleadings filed in early 2023, held evidentiary hearings on June 22, 2023, July 10, 2023, September 14, 2023, and December 12, 2023.

On June 1, 2023, the Court entered an Order appointing Attorney Jenna M. Fliszar to act as guardian ad litem (GAL) for the Children. The Order provides in relevant part that the GAL "shall be permitted to visit and speak with the Children, as well as all family members and medical and/or social service providers who have records, reports and/or information relevant to the custody of the Children." The Order also directed the GAL to issue a report not later than 20 days prior to the trial.[6]

---

[5] On May 26, 2023, the Court entered an Order denying Father's request for relief on an emergency basis.
[6] The Court erred by including this standard language in the Order. Several hearings would be required to address the outstanding issues in this case, and any report issued prior to the completion of testimony would be premature.

9

After the GAL advised the Court that Mother had failed to cooperate with her efforts to speak with Mother and Daughters, the Court, on June 9, 2023, entered an Order directing Mother to show cause why she should not be held in contempt of the Order entered on June 1, 2023, and scheduling this matter to be heard at the hearing scheduled for June 22, 2023.

During the hearing held June 22, 2023, the GAL stated that after her appointment she reached out to Mother for the purpose of setting up a time to interview Daughters, but Mother told the GAL that she must provide responses to certain questions before she would permit the GAL to speak to Daughters. Many of the questions were related to the GAL's position regarding reunification therapy and alienation syndrome. When the GAL refused to answer these questions, Mother refused to make Daughters available for an interview. Mother asserted that she had the right to know the GAL's position regarding reunification before permitting the GAL to interview Daughters, and blamed the GAL for her inability to meet with Daughters. The Court advised Mother that the purpose of the GAL was to provide independent recommendations to the court, and therefore, she had no obligation to provide satisfactory answers to Mother before being permitted to fulfill her responsibilities. Mother assured the Court that she would cooperate with the GAL and the Court considered this matter closed.

Allison Otto, Psy.D., testified at the hearing held June 22, 2023. Dr. Otto was accepted by the Court as an expert in the fields of clinical psychology and child and family psychology. Dr. Otto testified in relevant part as follows:

- Dr. Otto has provided expert testimony regarding reunification therapy on approximately twenty prior occasions.

- Father paid Dr. Otto the sum of $2,800.00 to appear in court and present expert testimony.

10

- Dr. Otto noted that the term "reunification therapy" is a misnomer, and is really the implementation of family therapy when there has been separation within the family for an extended time-period. Family therapy should be court ordered to impose parental accountability.

- Regarding whether it is appropriate to return a child to an abusive parent, Dr. Otto stated that it depends upon the circumstances of the case. Reunification therapy works as long as one parent does not sabotage the process. However, if the abusive parent shows an unwillingness or inability to address issues, or if a return of the child would be unsafe for the child, then reunification therapy is not appropriate.

- Because Mother advised Dr. Otto that he was seeing a therapist on a regular basis, Dr. Otto advised Mother that she needed to speak to Mother's therapist. Dr. Otto attempted on several occasions to reach Mother's therapist. When Mother advised Dr. Otto that her therapist was on medical leave, Dr. Otto asked Mother to have her therapist call Dr. Otto. However, Dr. Otto never received a call from Mother's therapist, and therefore, she was never able to confirm that Mother actually has a therapist.

- Dr. Otto attempted for several weeks to schedule an appointment with Mother and Daughters, but Mother refused to schedule an appointment. Daughters were ultimately set up for therapy with therapists through Otto Psychological.

- Father cooperated with Dr. Otto and engaged in therapy with a therapist through Otto Psychological.

11

- Pursuant to the Interim Order entered on December 30, 2021, the therapists for the Children were authorized to communicate with one another and with Dr. Otto. Daughters' therapists advised Dr. Otto that therapy, which had been going on for approximately one year, was proceeding well, and the consensus of the therapists was that the family was ready to move forward with reunification therapy.

- At the point in time when reunification therapy was scheduled to commence, each Daughter, accompanied by Mother, advised her therapist in the office waiting room that she "no longer trusts" her therapist. Daughters' therapists advised Dr. Otto that Daughters' communication with the therapist appeared to be "scripted."

- Mother stopped Daughters' therapy sessions and stopped communicating with Dr. Otto. In addition, Ms. Jones Soderman sent Dr. Otto a letter which terminated her services and effectively put an end to the reunification process.[7]

- Dr. Otto believes that Father was motivated to rebuild his relationship with Daughters. However, Dr. Otto also believes that reunification therapy is no longer an option because Mother is unequivocally opposed to Daughters reunifying with Father. Dr. Otto does not believe that using different therapists will make any difference, given Mother's complete objection to the concept of reunification therapy. Therefore, when questioned whether the Court should once again order the Parties to engage in reunification therapy, Dr. Otto

---

[7] Exhibit P-16.

12

answered "no," noting that the prior reunification effort had been derailed and attempting to implement it once again could backfire.

- Dr. Otto believes that reunification therapy was appropriate in this case, but was sabotaged by Mother.

- Dr. Otto does not have any recommendation regarding placement of the Children because she did not perform a custody evaluation.

- Despite termination of the reunification process, Dr. Otto strongly recommended that the Children continue with their therapy.

- Dr. Otto described Mother, Father, and the Children as a "family in crisis." She believes that the chronic, unresolved issues between Mother and Father will likely lead to the Children developing problems as adults, noting that unless the current situation changes, the Children are at risk of, among other things, engaging in toxic relationships and substance abuse.

- Because reunification therapy is not an option, Dr. Otto recommended use of an intense in-home family support system that would serve the family 10 to 15 hours per day.

- Father's counselor did not express to Dr. Otto any concerns regarding the safety of the Children with Father. In addition, none of Daughters' therapists expressed concern to her regarding abusive behavior by Father.

- Dr. Otto believes that Ms. Jones Soderman maintains an incredibly biased perspective, noting that she made serious accusations about Father and C.T. without ever speaking to Dr. Otto or Father, and that because Ms. Jones

13

Soderman is not licensed in Pennsylvania, she can say and do whatever she wants without fear of any consequences for her actions.

- Dr. Otto expressed concern about the interview of Ms. Jones Soderman in which she admitted that she has assisted parents in hiding children and effectively vilified the family court system. Dr. Otto believes that the opinions expressed by Ms. Jones Soderman are destabilizing and cause irreparable harm to families.[8]

Although she had not been able to meet with Daughters, the GAL, cognizant of the requirement in her appointment order that she prepare and file a report, filed a Report on July 9, 2023 (hereinafter "Interim Report").

The Court scheduled an additional hearing for July 10, 2023. On June 28, 2023, Mother moved for a continuance of this hearing, claiming that she required additional time to secure legal counsel. On July 3, 2023, the Court entered an Order denying Mother's motion for a continuance.[9]

The Court heard testimony from Father at the hearings held July 10, 2023, and December 12, 2023. Father testified in relevant part as follows:

- Father denies assaulting Mother in 2011. According to Father, he merely grabbed Mother by the arm, but Mother falsely claimed to the police officer that Father had assaulted her in front of the Children. Father was arrested and

---

[8] Exhibit p-17.

[9] The Court perceived Mother's continuance application as merely a means to delay the proceedings. Mother had several months to secure new legal counsel but had made no effort to do so, and during this period Mother, who was purportedly proceeding as a self-represented litigant, had filed detailed pleadings obviously prepared by someone with a pretension to legal acumen. Following the hearing held July 10, 2023, Mother continued to proceed as a self-represented litigant and to file pleadings and memoranda of law that were ghostwritten.

14

charged with simple assault after the police observed a red mark on Mother's arm.

- Mother called the police on C.T. over 20 times between the time C.T. was 8 years old and when he was 12 years old in 2020.

- C.T. began to live with Father when Mother told him to pick C.T. up from her home.

- C.T. is happy living with Father, excelling in school, participating in wrestling, and attending therapy with Dr. Philip Kinney.

- C.T. reached out to Mother because he is interested in participating in reunification therapy and having a relationship with her, but his efforts have been rebuffed by Mother.

- Father stated that he always had a good relationship with Daughters until Mother terminated his custody time in July 2020. Father presented videos of C.T. and Daughters at his home prior to July 2020 that show the Children playing and appearing happy.

- In July 2020, Mother terminated Father's custody time with Daughters. Mother falsely claimed that Father had interacted with Daughters and her without informing them that he was infected with COVID-19.

- Since July 2020, Father has had no contact with Daughters, other than seeing them during the custody evaluation by Dr. Esteve, in court, and at a distance at school events.

- Father denies physically or verbally abusing Daughters in any way, such as sticking his finger up their noses, grabbing their wrists, showing them

15

pornographic videos, hitting them with a belt, making them sleep in his bed when he was in his underwear, or forcing them to drink milk or eat meat.

- Father believes that Mother has poisoned Daughters' minds against him, and since hiring the Foundation has gone on the offensive and attempted to bully and intimidate him and anyone who does not agree with her. The Foundation has, among other things, accused C.T. of being a "predator" and Father of sexually and physically abusing Daughters.

- Father believes that Daughters should be placed in his sole legal and physical custody. Father acknowledges that his initial time with Daughters would be "challenging." Although Father has not had visits with Daughters since July 2020, he believes that he would be able to assume immediate custody of Daughters because he had an amazing relationship with them until July 2020, and his prior relationship with Daughters will return once he has custody of them and appropriate therapy is in place.

- Father has expended more than $25,000.00 in attorney's fees related to the filing of contempt petitions against Mother, but is only requesting an award of attorney's fees in the amount of $25,000.00.

Mother offered testimony during the hearings held July 17, 2023, August 14, 2023, and September 14, 2023. Mother testified in relevant part as follows:

- Father has been attempting to alienate her from the Children since the time when they lived together as a family.

16

- Mother stated that when the Parties lived together Father was physically abusive toward her and often referred to her as a "bitch." Mother described being assaulted by Father in 2011 and obtaining a PFA against him.

- Mother stated that, in or about June or July 2020, Daughters opened up to her and told her all of the things that had occurred when they were in Father's custody. Mother stated that Daughters became fearful of Father because of how he treated them.  According to Mother, Father would sneak meat into Daughters' food (e.g. quesadillas) and force them to eat the food even though they were vegetarians; forced Daughters to drink milk; cracked Daughters' knuckles against their will; forced Daughters to watch an R-rated movie when they were five to six years old; hit Daughters with a belt; locked Daughters in a room; tickled Daughters even though they begged him to stop; put Daughters' fingers up his nose; and forced Daughters to drink vinegar.

- Mother stated that she stopped Father from seeing Daughters to protect them from an abusive father.  Mother asserts that she did not willfully violate the custody orders by prohibiting Father from seeing Daughters, but rather honored Daughters' wishes not to see him.

- Mother stated that she shared information about Father's abuse of Daughters with their therapists and advised them that Daughters had no desire to participate in therapy.

- Mother stated that she has participated in individual therapy with Krysta Klobosits on a weekly basis since September 2022. Mother claimed that she does not know whether Dr. Otto spoke with Ms. Klobosits.

17

- Mother stated that she refused to participate in reunification therapy because it would result in the return of abused children to the person who committed the abuse, and therefore, constitutes child abuse.

- Mother believes that Father is grooming C.T. to become a predator like him, and that C.T. is "extremely abusive."

- Mother acknowledged that she is a client of Ms. Jones Soderman and that Ms. Soderman was acting on her behalf when she sent letters to Dr. Otto, the GAL, the custody hearing officer, Dr. Esteve, counsel for Father, and the undersigned judge. While Mother does not agree with all statements made by Ms. Jones Soderman in her letters, she never asked Ms. Jones Soderman to retract the statements with which she did not agree.

- Mother showed Daughters Dr. Esteve's custody evaluation.

- Mother showed Daughters the GAL's Interim Report.

- Mother sent a letter to the custody hearing officer accusing her of "colluding" with the GAL because the focus of the conference was on whether Mother would cooperate with the GAL. Mother admitted that she was afforded the opportunity to fully explain her position to the custody hearing officer during the conference.

- Mother acknowledged that, following the GAL's meeting with Daughters at Mother's home on July 14, 2023, she sent a complaint about the GAL to the Lehigh County Bar Association, and this letter stated that Daughters have "endured threats, coercion, and physical, and sexual abuse by Father," and that

18

her "teenage son is not only a danger to our family but also the community, as he grows in his skills as a predator and burgeoning psychopath."

- Mother acknowledged that Father did not sexually abuse Daughters.

- Mother acknowledged that, without the knowledge and consent of the GAL, she secretly recorded the conversation between the GAL and Daughters during the meeting held July 14, 2023, and is in possession of the digital file of the audio recording.[10]

- Mother stated that she is opposed to reunification therapy and is requesting that Daughters be permitted to decide if and when they see Father.

On July 17, 2023, Mother filed a Motion to Strike the GAL's report, and on August 2, 2023, filed an Emergency Motion to Remove and Replace the GAL. The Court heard testimony regarding Mother's motion at the hearing held September 14, 2023. Mother claimed that the GAL was biased and prejudiced against her, had failed to review certain records, and had failed to communicate with Mother regarding matters affecting the Children. On September 22, 2023, the Court entered an Order denying Mother's motion.[11]

The Court scheduled an additional hearing for October 5, 2023, at 9:00 AM. On September 26, 2023, Mother moved for a continuance of the hearing on the grounds that she was scheduled to attend a hearing in an unrelated case on October 5, 2023, at 1:30 PM. Attached to the application was a scheduling order with the date and time of the hearing, but Mother had redacted the caption

---

[10] The Court instructed Mother to place the digital file on a flash drive, provide the flash drive to Father's counsel and the GAL, and be prepared to play the digital file at a future court hearing.

[11] The Court determined that Mother's motion was baseless, particularly because Mother was complaining that the GAL was not doing her job while refusing to cooperate with the GAL so that she could do her job.

19

of the case. The Court granted Mother's application for a continuance on the grounds that she had a scheduling conflict.[12]

On September 28, 2023, Father moved for reconsideration. Upon further review of Mother's application for a continuance, the Court determined that Mother had not obtained the position of Father's counsel and the GAL prior to requesting the continuance, that the hearing in the unrelated case was in Palm Beach County, Florida, and that Mother was scheduled to participate in the Palm Beach County hearing via Zoom.[13] Because the custody hearing in Lehigh County would end no later than Noon and Mother would have adequate time to return home and participate by Zoom in the Palm Beach County hearing, the Court entered an Order on September 29, 2023, vacating its prior order and re-listing this case for a hearing on October 5, 2023, at 9:00 AM.

On October 4, 2023, Mother filed an Emergency Ex Parte Verified Motion and Memorandum of Law to Recuse or Disqualify Judge Caffrey. The Court heard testimony from Mother in support of her motion at the outset of the hearing held on October 5, 2023. Among other things, Mother claimed that the undersigned judge was biased against her and improperly influenced by the recommendations contained in the GAL's report. The undersigned judge explained to Mother that he had not read the GAL's Interim Report, which he considered incomplete because it was filed prior to the completion of testimony in this matter, and had not

---

[12] The Court erred by failing to recognize that Mother had not obtained the position of the GAL or Father's counsel prior to moving for a continuance.

[13] The Court attempted to contact the Court Administrator and the assigned Judge in Palm Beach County to determine whether Mother was required to appear in person for the scheduled hearing. When the Court was unable to reach either the Court Administrator or assigned Judge, the Court spoke to counsel for the opposing party in the Florida case for the sole purpose of determining whether Mother was required to appear in person for the scheduled hearing. Counsel advised the Court that Mother was scheduled to appear for the scheduled hearing via Zoom.

20

made any decision regarding the merits of the case.[14] Mother also claimed that the undersigned judge had acted improperly by reaching out to counsel for the opposing party in the Palm Beach County case. The undersigned judge explained to Mother that he spoke to counsel only after he had been unable to speak to the Court Administrator or assigned Judge, and had spoken to counsel for the sole purpose of determining whether the Palm Beach County hearing was being held in person or by Zoom. The undersigned judge also explained to Mother that he would end the hearing no later than Noon so that she could return home for the Zoom call. On October 5, 2023, the Court, finding that he had no bias, ill will, or prejudice toward Mother, and had an open mind regarding the merits of the case, entered an Order denying Mother's motion.

At the hearing held on October 5, 2023, the Court conducted a second in-camera interview of the Children. The Court's interview of C.T. was brief. C.T.'s testimony was essentially the same as the testimony he gave during the first in-camera interview. C.T. expressed his frustration with the ongoing custody proceedings and indicated that he just wanted all of it to be over. Similarly, the Court's interviews of Daughters covered much of the same ground covered during the first set of interviews. Daughters once again detailed the behavior of C.T. and Father that they found offensive, and once again emphasized that they have no interest in resuming a relationship either with C.T. or Father. However, Daughters added the claim that Father had shared the bed with them while he was in his underwear, showed them an R-rated horror movies, and forced them to eat meat and drink milk.[15]

---

[14] During the hearing, the GAL stated that she would withdraw her Interim Report and prepare and file a final report upon the conclusion of testimony.

[15] The hearing was concluded prior to Noon.

In the absence of any expert guidance following Mother's termination of Dr. Otto, on October 11, 2023, the Court entered an Order appointing Dr. Esteve to conduct a re-assessment of the custody evaluation.

However, on October 19, 2023, Ms. Jones Soderman penned a letter to Dr. Esteve, with a copy to the Court, stating in relevant part that the undersigned judge "has attempted to appoint incompetent, unqualified, biased, factotums to improperly force his directives for custody transfer to the children's abuser," and that "[i]t appears that your appointment is a further attempt to accomplish an illegal, ill-advised directive." Furthermore, in a thinly-veiled attempt to influence and intimidate Dr. Esteve, Ms. Jones Soderman further stated:

> We are writing to you in this regard to place you on notice that your presence in this case is an unacceptable additional attempt by this judge to force contact with the children with a parent whose parental rights require termination. These children need to be free from ever having to be faced with the trauma of reliving these experiences with him, and that includes improperly informed court orders that are in line with the Richard Gardner debunked theories of parental alienation.

In addition, on October 25, 2023, Father moved for reconsideration and opposed the re-appointment of Dr. Esteve. Mother supported the re-appointment of Dr. Esteve. Following a hearing on October 30, 2023, the Court entered an Order on November 1, 2023, vacating the Order appointing Dr. Esteve to conduct a re-assessment of the custody evaluation.[16]

On October 27, 2023, Father filed a Petition for Contempt. Mother filed a Response on November 13, 2023.

---

[16] In view of the attempt by Ms. Jones Soderman to influence and intimidate Dr. Esteve, and the Court's belief that Mother would not cooperate with anyone who did not fully subscribe to her view that Father represents a danger to Daughters, the Court concluded that there was no reasonable expectation of being able to obtain impartial and independent expert guidance without additional protracted litigation that would further delay a final decision in this case.

22

On November 13, 2023, Mother filed an Emergency Verified Motion to Review the Guardian Ad Litem's Case Documents, Records, and Reports. On December 4, 2023, the Court entered an Order denying Mother's motion.

The Court held a final hearing on December 14, 2023. The Court and the participants listened to the surreptitiously-obtained audio recording of the meeting between the GAL and Daughters on July 14, 2023. The audio recording corroborated the GAL's account of what transpired during the meeting. The Court also heard testimony from Father in support of the Petition for Contempt filed on October 27, 2023. Finally, the Court heard testimony from the GAL, who testified in accordance with the findings and recommendations contained in the Final Report she filed on November 22, 2023. The primary points made by the GAL are as follows:

- Father was cooperative with the GAL and set up a meeting for the GAL to speak with him and C.T. Father told the GAL that he believes he once had a good relationship with Daughters before this relationship was terminated by Mother Father did not disparage Mother while speaking to the GAL.

- GAL initially reached out to Mother via email, but Mother repeatedly ignored her attempts to set up a meeting. When Mother finally responded to the GAL, she demanded that they meet in a public place. The GAL told Mother it would not be appropriate to meet in a public place given the confidential nature of what they would be discussing. Instead, the GAL and Mother spoke over the phone.

- During the phone call between Mother and the GAL, Mother was repeatedly unwilling to answer even simple questions posed by the GAL, stating that she needed time to prepare answers to questions, such as whether she opposed

23

reunification and what role the Foundation was playing in the case. Each time a question was posed to Mother, the GAL heard a click, followed by silence. This raised the suspicion of the GAL, who asked Mother if the call was being recorded, or if someone else was on the call. Mother stated that she was not recording the conversation, but there was another person on the line listening to the conversation. When the GAL requested that Mother ask the other person to leave or, alternatively, identify this person, Mother refused. When the GAL attempted to schedule a time to meet with Daughters, Mother repeatedly stated that Daughters were busy until the upcoming hearing. After the GAL made several attempts to get Mother to understand the necessity of the GAL meeting with Daughters, Mother stated she would check their availability and then hung up abruptly.

- Mother raised additional obstacles to the GAL meeting with Daughters. Mother attempted to have the GAL disqualified. Ms. Jones Soderman, on behalf of Mother, sent the GAL a letter accusing her of bias, accusing C.T. of abusing his sisters, and accusing officers of the court of engaging in a criminal conspiracy against Mother.

- On June 12, 2023, the GAL met with C.T. and Father at Father's home. C.T. described how he and Father worked out together, threw football, and often got dinner at Whole Foods. C.T. described his good academic performance and generally seemed content to live with Father. The GAL spoke to C.T. outside the presence of Father, and C.T. spoke about his relationship with his sisters. C.T. explained an incident in which he bought flowers and cards to court for his

24

sisters but Mother intercepted them, and C.T. later found them in the trash. C.T. stated that his relationship with his sisters used to be good, but now they ignore him. C.T. further explained that Father expresses to him how he wants C.T. to have a relationship with his sisters, but Father does not seem to care about C.T. having a relationship with Mother.

- Mother eventually permitted the GAL to meet with Daughters at Mother's home on July 14, 2023. When the GAL arrived at Mother's home, Mother instructed the GAL where to sit. Although Mother left the area where she met with Daughters, Mother remained close by in an adjacent room. Daughters appeared to the GAL to be coached. Daughters refused to speak separately with the GAL, refused to speak to the GAL in private outside the home, and stated simply that they did not want to live with Father or C.T. One Daughter told the GAL that she did not trust her because she had issued an order saying that Daughters had to live with Father. The GAL attempted to correct this misunderstanding, but Daughters did not want to hear it. Mother then falsely accused the GAL of making Daughters cry and ushered the GAL out of the home after less than 20 minutes.

- Mother acknowledged that she secretly recorded the meeting between the GAL and Daughters. The GAL listened to the audio recording and it accurately captured what was said during the meeting.

- The GAL expressed her frustration with the current stagnation in this case. She explained that each parent presents a troubling option. Father, on one hand, has caused Daughters to fear him through his past behavior. Of special concern to

25

the GAL were his conviction for Simple Assault against Mother and his outburst in Court on October 22, 2023. This outburst occurred when Father, while the Judge and his staff were interviewing the Children, expressed his interest in interacting with Daughters, and the GAL expressed that Father seeing the Daughters that day could prove traumatizing to them. Father angrily disagreed with the GAL and caused a scene that required intervention by a deputy sheriff. Moreover, Father seems unrealistic in his expectations of how smoothly he expects reunification to go. He believes the love and affection Daughters once expressed towards him will win out, while the GAL believes it will be much more complicated than that. The GAL believes, however, that Father succeeded in improving himself over the past three years.

- Mother, by contrast, has only declined in the view of the GAL. Mother has accused the GAL and court personnel of criminal conspiracy, and, perhaps most disturbingly, accused her own son of criminal abuse despite no evidence to support this claim. Moreover, Mother refuses to refer to C.T. as her son, and has expressed her intention to disregard and disobey the express orders and recommendations of everyone involved in this case, except for the Foundation.

- The Foundation's involvement and participation in this case is particularly. concerning to the GAL. Mother believes in and supports this organization's philosophy and tactics. The Foundation, which is operated by a person who has lost her license to practice psychology in multiple states, has acted to assist mothers in absconding with their children in order to avoid lawful court orders.

26

- Based in part on her consultation with Dr. Esteve, the GAL recommends that the Court enter an order placing Daughters in Father's custody. She reasons that while Daughters will likely be traumatized by this option, they are also currently being traumatized while living with Mother, and this course of action moves the family forward rather than leaving them in the disparate state that they currently find themselves stuck in.

## II. CUSTODY

Various petitions to modify and petitions for special relief are outstanding in this case. Father seeks to maintain sole legal and primary physical custody of C.T., and to have Daughters placed in his sole legal and physical custody as a remedy for what he contends is parental alienation by Mother. Theorizing that any contact between Father and Daughters creates a risk of physical and emotional harm to Daughters, Mother seeks sole legal and physical custody of Daughters, and for Daughters to visit with Father in their sole discretion. Mother seeks no custodial rights regarding C.T.

### A. Custody Factors

Under the Child Custody Act, 23 Pa. C.S. §§ 5321-5340 ("Custody Act"), the paramount concern in every custody case is the best interest of the child. See 23 Pa. C.S. § 5328. What is in a child's best interest must be evaluated on a case-by-case basis, giving consideration to "all factors that legitimately affect the child's physical, intellectual, moral and spiritual well-being." McAlister v. McAlister, 747 A.2d 390, 391 (Pa. Super. 2000). Subsection 5328(a) of the Custody Act, 23 Pa. C.S. §§ 5328(a), sets forth sixteen factors that a court must consider before making any custody determination ...." E.B. v. D.B., 209 A.3d 451, 460 (Pa. Super. 2019). The Court

27

must consider all of the factors, but, as the finder of fact, must "determine which factors are most salient and critical in each particular case." M.J.M. v. M.L.G., 63 A.3d 331, 339 (Pa. Super. 2013).

The Court analyzes the general custody factors set forth in 23 P.S. § 5328 as follows:

**Custody Factor 1: Which party is more likely to encourage and permit frequent and continuing contact between the child and another party?**

The controlling custody order theoretically grants Father sole legal and primary physical custody of C.T., Mother partial physical custody of C.T., Mother sole legal and primary physical custody of Daughters, and Father partial physical custody of Daughters.

In practice, although Father is extremely interested in spending time with Daughters, Mother has not permitted Father to see Daughters since July 2020. Mother claims that Father physically and emotionally abused Daughters in the past, and she is simply protecting them from further harm by Father. On the other hand, Mother has no interest in seeing C.T., going so far as to claim in the complaint she filed with the Bar Association that C.T. is a "predator" and "burgeoning psychopath." While it is difficult to discern whether Mother actually believes the disparaging and inflammatory remarks she has made about C.T., or whether she is simply parroting the "threats and intimidation" strategy obviously advocated by the Foundation, Mother, when questioned directly by the undersigned judge about whether she wants a relationship with C.T., offered non-committal answers at best.

Therefore, Father is clearly the parent that is more likely to encourage and permit frequent and continuing contact between the Children and Mother.

28

Custody Factor 2: The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child. Includes criminal convictions under 23 P.S. §5303 and information set forth in §5239.1(a)(1) (relating to consideration of child abuse and involvement of protective services).

Mother claims that Father emotionally abused her during their marriage by, among other things, calling her a "bitch." Mother also claims that Father physically abused her during their marriage. Mother's claim that Father physically abused her rests primarily upon Father's conviction for simple assault predicated on a physical altercation between the Parties in 2011, and Father being charged with indirect criminal contempt on two occasions following the entry of a PFA Order against him.[17] From Mother' perspective, Father's abuse of her is consistent with his later abuse of Daughters, and she stopped Father's custodial time with Daughters and opposed reunification therapy for the purpose of protecting Daughters from Father's abuse.

Mother claims that, on November 23, 2011, Father physically assaulted her by choking her, pulling her hair, and punching her. Father claims that he merely grabbed Mother's arm and was arrested only because the police officers observed a red mark on Mother's arm. Father eventually pled guilty to simple assault by mutual combat and agreed to the entry of a final PFA Order which prohibited him from contact with Mother.

The Court finds credible Father's description of what happened during the physical altercation between the Parties. In addition, while Mother described what can only be considered

---

[17] This is best illustrated by the statements made by Mother in her letter to the custody hearing officer, dated June 23, 2023 (Exhibit P-28). Mother stated that the only reason there is no evidence of abuse by Father is "because no court actor or professional therapist has done their job and thoroughly investigated [F]ather." According to Mother, a thorough investigation of Father would have revealed what is set forth in the Lehigh County Court of Common Pleas Court Summary (Exhibit D-14): "Disposition date 02/23/2012 two (2) counts of Simple Assault (M3 & M2) and two (2) arrests for violating protection from abuse court orders." What Mother stated in her letter to the custody hearing officer is consistent with Mother's testimony throughout the custody trial.

29

a serious, unprovoked attack, Father pled guilty to simple assault by mutual combat. Furthermore, while Mother consistently pointed out that Father was arrested on two occasions for violating the PFA Order, she never described the conduct upon which these arrests were predicated, and both indirect criminal contempt complaints against Father were dismissed.

The evidence does not support Mother's attempt to paint Father as a "predator." The Court's impression is that Mother remains extremely focused on what occurred between she and Father during their marriage, particularly the 2011 physical altercation, and that her antipathy toward Father has significantly impacted her view of Father's relationship with Daughters and her own relationship with C.T.

Mother also considers Father a threat to Daughters based upon their description of Father's behavior while they were in his care. Mother stated that Daughters opened up to her about the abuse in the summer of 2020. When Daughters were questioned about why they experienced such a sudden change of heart about Father in July 2020, they stated that they started to think about the things Father had done and realized that they no longer wanted to have any contact with him.

Some of the things that Daughters claim Father did are, if true, weird behavioral quirks (e.g., tickling them to the point they could not breathe, putting his feet on them, and taking their hands and sticking their fingers up his nose). Other allegations made by Daughters are more serious, such as Father forcing Daughters to belittle Mother, hitting Daughters with a belt, grabbing Daughters' wrists hard enough to leave marks, making Daughters stay in Father's bed while he was in his underwear, and forcing Daughters to eat meat even though they told Father they were vegetarians.[18]

Father denies any suggestion that he did anything improper toward Daughters. The only

---

[18] While Ms. Jones Soderman boldly claimed in one of her letters that Father had sexually abused Daughters, neither Daughters nor Mother have made this claim.

30

claim by Daughters that he even acknowledged was their claim that they spent time in Father's bed while he was in his underwear. However, Father credibly testified that he and the Children would watch TV in Father's bed and during those times he was always properly clothed. While neither Party presented any testimony from Children and Youth Services ("CYS"), Father asserted that CYS had investigated some of the allegations made by Daughters, including the allegation that Father made them watch an R-rated movie with sexual content, and all investigations proved to be "unfounded." Mother did not dispute Father's testimony.

The Court interviewed Daughters on two occasions, and on each occasion Daughters were emphatic about not wanting to see Father because of the things that he had done. The Court believes that Daughters' feelings are sincerely held. The question presented is why Daughters' sincerely-held feelings about Father are clearly disproportionate to the nature of Father's purported behavior.

The Court finds credible Father's testimony that he had a very good relationship with Daughters prior to July 2020, and the videos of the Children appear to corroborate Father's claim. Daughters' explanation for their sudden change of heart is that they started to think about the things Father had done and realized that they no longer wanted to have any contact with him. Mother's position is that she is merely supporting the decision made by Daughters. However, given Mother's ongoing belief that Father had physically and emotionally abused her, the deterioration of Mother's relationship with C.T. and her belief that he was following in Father's footsteps, Daughters' young age and their sudden change of heart about spending time with Father, it is reasonable to deduce that Mother controlled, or at the very least significantly influenced, Daughters' feelings about Father.

Daughters do not want to see C.T. or have a relationship with him. Each stated that C.T.

31

would physically hurt and threaten them. S.T. shared that C.T. threatened to kill her in her sleep, which resulted in her having a difficult time sleeping at night. P.T. claimed that C.T. pulled her hair, leaving a bald spot. Daughters stayed consistent with their stories about C.T., claiming that C.T. punched and kicked them and called them names. Both Father and C.T. deny these claims. Daughters also alleged behaviors more consistent with typical brotherly teasing, where C.T. would not let them in his room or would turn off the lights to scare them.

As with Father, while the Court believes that Daughters' feelings about not wanting to see C.T. are sincerely held, their assertion that they never want to see or talk to C.T. again is a disproportionate response to C.T.'s purported behavior. Daughters reported C.T. to school officials when he attempted to speak to them at school, and when C.T. attempted to give them flowers at a court hearing in 2022, Daughters disposed of the flowers in a courthouse trash bin.

The Court believes that C.T. may very well have acted out toward his sisters. However, the totality of the circumstances clearly suggests that Daughters' position vis-à-vis C.T. goes far beyond just his poor behavior. Given Mother's feelings toward Father, it is not surprising that she did not attempt to co-parent with him regarding C.T.'s behavioral issues. However, Mother made no effort to address C.T.'s behavioral issue by any other available means. Instead, in July 2020, Mother unilaterally decided that C.T. would live with Father and Father would no longer have any contact with Daughters. Mother then considered the matter closed, refusing to participate in co-parent counseling and reunification therapy, and, to justify her actions, painting Father has a "predator" and C.T. as a "predator and burgeoning psychopath."

The Court sees no risk of harm to Daughters by permitting Father to exercise visitation with Daughters supervised by an intense family therapist provider, followed by Father exercising periods of partial physical custody.

32

**Custody Factor 3: The parental duties performed by each party on behalf of the child.**

While the Parties were together, they modeled traditional roles, whereby Mother was the Children's primary caretaker and performed all parental duties, (e.g., preparing meals, maintaining the home, and taking the children to doctor and dentist appointments), while Father was the "breadwinner," and assisted around the house when he was available. Under the present custodial arrangement, Father performs all parental duties relative to C.T., while Mother performs all parental duties relative to Daughters. There is no concern about either Party's ability to perform parental duties.

**Custody Factor 4: The need for stability and continuity in the child's education, family life and community life.**

Since July 2020, C.T. has resided with Father and Daughters have resided with Mother. Each of the Children attends school in the Parkland School District. C.T. attends Parkland High School. Daughters attend Orefield Middle School. Each of the Children performs well academically and is actively engaged in activities. C.T. has a good relationship with Father. Daughters have a good relationship with Mother.

Father's position is that Mother has so poisoned Daughters' minds against him that the only appropriate remedy is to remove Daughters from Mother's custody and place them in his sole legal and physical custody. This is the recommendation of the GAL as well. Mother is adamantly opposed to Father having any contact with Daughters, and wants Daughters to decide if and when to see Father.

The Court has given long and serious consideration to all options, including maintaining the status quo as well as removing Daughters from Mother's custody and placing them in Father's sole legal and physical custody.

Maintaining the status quo appears on the surface to enhance stability and continuity in the

33

Children's lives. However, Dr. Esteve and Dr. Otto have independently opined that the lack of a parent-child relationship is likely to adversely affect a child later in life. Dr. Otto stated that the chronic, unresolved issues between Mother and Father will likely lead to the Children developing problems as adults, noting that unless the current situation changes, the Children are at risk of, among other things, engaging in toxic relationships and turning to substance abuse. Dr. Esteve stated in his Report that if the Parties "do not change their relationship their Children are all at high risk of substantial difficulties in their adolescence and adult life." *Esteve Rpt., p. 57.*[19] Therefore, the Court disagrees with Mother's proposal that the custodial situation remain status quo.

The Court also does not agree with the proposal to remove Daughters from Mother's custody and place them in the sole legal and physical custody of Father. The Court believes that there is a significant risk that adoption of this drastic remedy would jeopardize Daughters' need for stability and continuity in their education, family life and community life.

Dr. Esteve provided valuable expert testimony regarding the results of his custody evaluation and offered solid recommendations for the reunification of the family. Dr. Otto provided valuable expert testimony regarding reunification therapy, how and why the plan for reunification therapy for this family failed, the impact of a strained parent-child relationship on the well-being of a child, and this family's need for ongoing services. However, neither Party presented any expert testimony concerning the precise issue at hand, that is, the appropriate course of action where, as here, reunification therapy has been sabotaged by one of the parents.

The GAL's recommendation is premised in large part on her out-of-court discussion with Dr. Esteve. Neither Party objected to the GAL's testimony relaying Dr. Esteve's recommendation

---

[19] Exhibit D-4.

34

that Daughters be removed from Mother's custody and placed with Father.[20] While the Court was clearly interested in appointing Dr. Esteve to conduct a re-assessment of his custody evaluation for the purpose of hearing expert testimony regarding the options available to the Court now that the original reunification plan has been derailed, the Court is reluctant to rely upon an expert opinion that was not subject to in-court cross-examination. In addition, while Dr. Esteve had considerable contact with this family in 2021, he has not had direct contact with the family since that time.

The Court has interviewed Daughters at length on two separate occasions. While the Court believes that Daughters, whether or not fueled by Mother's animosity toward Father, have overreacted to Father and C.T.'s behavior, the Court also believes that their feelings about Father and C.T. are not concocted but rather are genuinely-held. Therefore, while the Court has no reason to believe that Daughters would be at risk of physical harm if placed in Father's custody, the Court believes that completely removing Daughters from Mother's custody would have a significant adverse impact on their emotional well-being.

Finally, while the Court recognizes Father's obvious love for Daughters and his ongoing efforts to reunite with Daughters, the Court also believes that Father fails to appreciate the depth of Daughters' animosity toward him, and underestimates the upheaval that would ensue should Daughters be uprooted from Mothers' home and placed with him on a full-time basis. Father naively believes that, with Mother out of the picture, his relationship with Daughters will return to normal in short order.

---

[20] See Pa. R.C.P. 1915.11-2 (Comment) ("[T]he guardian *ad litem* cannot serve as a mere conduit for hearsay or for the opinions of another person, including the subject child. The guardian *ad litem* cannot relate the opinion of a non-testifying witness unless the guardian *ad litem* has reasonably relied upon it. Upon appropriate objection from any party, the trial court shall strike any testimony or portion of the guardian *ad litem*'s written report that is inadmissible as hearsay if the requirements for Pa.R.E. 703 are not met.").

35

**Custody Factor 5: The availability of extended family.**

Paternal Uncle lives in Carlisle. Paternal Grandmother lives in Camp Hill, Pennsylvania. While the Parties were together, Paternal Grandmother would visit the Children once or twice a month. Daughters have not had contact with Paternal Grandmother or any member of their paternal extended family after Mother terminated Daughter's relationship with them.

Maternal Aunt and Maternal Uncle reside outside Pennsylvania. Maternal Grandparents live in Palm Beach County, Florida. The Children once had a good relationship with Maternal Grandparents, and would spend summers at their beach house in New Jersey. Daughters now have no contact with Maternal Grandparents and have not seen them for two years. Mother did not explain why Daughters no longer have contact with Maternal Grandparents, and Daughters were unable to provide a reason for the severed relationship.

Therefore, Daughters have no contact with extended family members on either Mother or Father's side.

**Custody Factor 6: The child's sibling relationships.**

Daughters and C.T. do not have any kind of relationship or contact with each other at the current time

Daughters each stated that C.T. would physically hurt them, making their relationship unpleasant. S.T. shared that C.T. threatened to kill her in her sleep, which resulted in her having a difficult time sleeping at night. P.T. claimed that C.T. pulled her hair, leaving a bald spot. Daughters stayed consistent with their stories about C.T., claiming that C.T. punched and kicked them and called them names. Daughters also alleged behaviors more consistent with typical brotherly teasing, where C.T. would not let them in his room or would turn off the lights to scare them.

36

Father denies these allegations and claims that the siblings got along well with each other. In fact, Father states he has never seen C.T. lay his hand on Daughters, although he admits that C.T. would tease them in a brotherly way.

C.T. seems very confused about why Daughters do not want contact with him. He shared that he loved his sisters and always treated them like sisters. C.T. states that he has attempted to reconnect with his sisters, offering them a simple wave at school and bringing flowers for them to a court proceeding in 2022. These attempts have been rejected consistently by Daughters (Daughters threw the flowers in a trash bin at the courthouse and reported C.T. to school officials when he attempted to speak to them at school).

## Custody Factor 7: The well-reasoned preference of the child, based on the child's maturity and judgment.

The Court interviewed each of the Children on two occasions. The interviews were in private and on the record. Each of the Children was respectful and able to communicate his or her thoughts and opinions to the Court in a meaningful way.

There was a good deal of friction building between Mother and C.T. over the years, and on several occasions, Mother summoned the police regarding C.T.'s behavior. Eventually Mother asked that C.T. be removed from her home and placed with Father. Perhaps due to maturity and/or living in a stable environment, C.T. has prospered since living with Father, and now recognizes the importance of having a mother-son relationship. C.T. has reached out to Mother, but his efforts to contact Mother have met with minimal response. Mother's refusal to communicate with C.T. is upsetting to him. The Court did not ask C.T. about whether he is aware of the disparaging remarks Mother has made about him.

C.T. also wants a relationship with his sisters and would like to make amends for whatever wrong he has done to them. He seems very confused by everything that transpired. C.T appears to

37

be happy living at Father's, and he wants to share those experiences with his sisters. He wishes for a custodial arrangement where he is still able to primarily live with Father and where his sisters are able to visit him and Father at Father's residence. C.T. just wants a relationship with his three sisters and Mother.

On both occasions on which they were interviewed by the Court, Daughters went into detail about the objectionable behavior by C.T. and Father. Although the Court interviewed Daughters separately, the testimony of each Daughter regarding C.T. and Father's behavior was essentially the same.[21] The Court is not sure whether such testimony is scripted and rehearsed, or simply the product of three teenage girls of the same age who share their lives with each other on a daily basis. Daughters are emphatically opposed to spending any time with Father, including something as simple as a lunch or dinner with him. They expressed fear that Father would physically and/or verbally abuse them if they start seeing him again.

**Custody Factor 8: The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

The Parties' complete disdain for one another has had a tremendously negative impact on the family as a whole and the Children individually. Both Parties are guilty of attempting to turn the Children against the other parent. Not surprisingly, C.T. proved loyal to Father and now lives with him, and Daughters proved loyal to Mother and now live with her.

On Father's end, Father encouraged Daughters to say negative things about Mother, and failed to take appropriate steps to correct C.T. when he was disrespectful to Mother and blamed Mother completely for the ongoing friction between she and C.T.

Mother's efforts to turn Daughters against Father are palpable.

---

[21] The Court would typically address each child separately, but in this instance Daughters' thoughts and opinions are so aligned that the Court is able to discuss them collectively without doing them any disservice.

38

The Court finds credible Father's testimony that he had a very good relationship with Daughters prior to July 2020, and the videos of the Children appear to corroborate Father's claim. Daughters' explanation for their sudden change of heart is that they started to think about the things Father had done and realized, in effect, that they no longer wanted to have any contact with him. Mother's position is that she is simply supporting Daughters' decision. However, given Mother's ongoing belief that Father had abused her, the deterioration of Mother's relationship with C.T. and her belief that he was following in Father's footsteps, and the fact that Daughters were merely ten-years old at the time, the Court believes that Mother, at the very least, significantly influenced Daughters' feelings about Father and their unwillingness to see him.

While Daughters' testimony and feelings about Father appeared genuine, there is also evidence to suggest that their testimony has been influenced to a significant degree by Mother. Mother has ensured that Daughters memorialized their allegations about Father on numerous occasions, including in letters to Father, therapy notes, and affidavits which Mother saw fit to have notarized.[22] Mother's claim that it was Daughters' idea alone to record their allegations in writing is simply not credible. Furthermore, when Mother testified about what Daughters had reported to her about Father in 2020, the Court advised Mother that, during the first interview, Daughters had not mentioned some of the alleged behavior listed by Mother. During the second interview, however, Daughters included the previously unreported behavior by Father in their testimony, clearly suggesting that Mother directly influenced Daughters' testimony.

Even if the Court believes that Father engaged in the described behavior, Daughters' reaction is disproportionate.[23] Instead of attempting to address Daughters' allegations about Father

---

[22] Exhibit P-27 and Exhibits C-1 thru C-6. Daughters' therapy notes remained private.

[23] Not only do Daughters not want to visit with Father, they do not want Father to attend school activities in which they participate.

39

either directly with Father, through therapy, or through some other appropriate available means, Mother—who already considered Father an "abuser"—terminated all contact between Daughters and Father and C.T.

Following Father's initiation of custody proceedings aimed at resuming his custodial rights, Mother has engaged in a course of conduct designed to sabotage any effort undertaken to effectuate a reunification of the family. Her conduct includes:

- Refusing to cooperate with Dr. Esteve's custody evaluation.

- Refusing to cooperate with co-parent counseling.

- Sabotaging reunification therapy by refusing to cooperate with Dr. Otto and terminating Daughters' therapy.

- Sabotaging the GAL's effort to perform her court-ordered role by refusing to cooperate with her, discussing the GAL's Interim Report with Daughters prior to the GAL's meeting with Daughters, secretly recording the meeting between the GAL and Daughters, and filing a complaint about the GAL based on false accusations.

- Sharing such sensitive documents as the custody evaluation and the GAL's Interim Report with Daughters.[24]

- Sending correspondence in which she characterized C.T. as a "predator" and "burgeoning psychopath."

- Authorizing the Foundation to send threatening and intimidating correspondence to the undersigned judge, Father's counsel, the custody hearing officer, the GAL, Dr. Otto, and Dr. Esteve, all containing untrue, defamatory and disparaging remarks about Father

---

[24] Given Mother's testimony that she believes Daughters have the right to see all documents related to them, the Court has no doubt that Mother has shared additional sensitive documents with them.

40

and C.T., as well as about the recipients themselves.[25]

**Custody Factor 9: Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

Regarding Daughters, Father has no relationship with Daughters and, whether Daughters' allegations about Father are accurate or exaggerated, will struggle to re-establish the father-daughter relationship. Father is, however, highly motivated to do so. Mother has a very good relationship with Daughters and Daughters see Mother as their protector. Unbeknownst to Daughters, Mother, by alienating Daughters from Father and sabotaging any effort to reunify the family, is harming Daughters in the long term.

Mother has no relationship with C.T. and it does not appear that she is interested in having one. Mother's penchant for disparaging C.T., as well as knowingly employing an outside organization to disparage her teenage son, all under the guise of protecting Daughters, is alarming.

**Custody Factor 10: Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.**

The Court incorporates herein by this reference the discussion under Custody Factor 3 and Custody Factor 9, respectively, as if set forth in full.

**Custody Factor 11: The proximity of the residences of the parties.**

Father and Mother's homes are located in Orefield, Pennsylvania, and both are within the Parkland School District. The distance between the Parties' homes is 2.5 miles.

---

[25] By way of example only, the letter written to the custody hearing officer by Ms. Jones Soderman, dated June 27, 2023, provides in relevant part as follows:

> The oldest son in this case is now known and documented to have become the Predator that his father is already documented to be. The son is accused of carrying out physical, sexual, and emotional abusive behavior towards his mother and his sisters. the child—who had a potential life similar to that of his sister's, full of promise—you have turned him into a vicious predator. His acts of predatory criminal behavior are documented, and legal action will be pursued.

41

**Custody Factor 12: Each party's availability to care for the child or ability to make appropriate child-care arrangements.**

Although Father works full time, he makes himself available for C.T. Because C.T. is 15 years old, he typically does not need additional childcare assistance. If Father were to need assistance, he could rely on Paternal Grandmother. Father shared that if he were permitted to exercise custody of Daughters, he would seek the help of a previously-employed nanny with whom Daughters are familiar.

Mother is a stay-at home-parent, and thus, she does not need child care assistance. Because Daughters are 13 years old, they do not need much in the way of additional childcare. Mother did not provide any information regarding who she would rely upon if she requires childcare assistance.

**Custody Factor 13: The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

The level of conflict between the Parties is extremely high. On a scale of 1-10, it is a 10.

Mother claims that Father physically and emotionally abused both Daughters and her, and has deemed him a "predator." Mother has adamantly refused to participate in reunification therapy on the grounds that she is protecting Daughters. Mother refuses to take any responsibility for her estranged relationship with C.T., and instead claims that Father is grooming C.T. to become a "predator" like him.

Father claims that Mother's allegations about him are either false or greatly exaggerated. Father denies any inappropriate behavior toward Daughters and insists that the deterioration of his relationship with Daughters is solely the result of Mother's plan to alienate Daughters from him. Father finds no fault in C.T.'s behavior and blames Mother completely for her estrangement from him.

42

The Children's ongoing exposure to such conflict and familial dysfunction has had severe consequences for the Parties' marriage and the Children.

**Custody Factor 14: The history of drug or alcohol abuse of a party or member of a party's household.**

There is no evidence of drug or alcohol abuse by either Party or any member of their households.

**Custody Factor 15: The mental and physical condition of a party or member of a party's household.**

There is no evidence that Father has any mental or physical condition that would impact his ability to parent the Children. Father, in accordance with the court-ordered reunification plan, has been participating in individual therapy with Dr. Karen Rizzolino since January 2023.

There is no evidence that Mother has any mental or physical condition that would impact her ability to parent the Children. Mother testified that she has been participating in individual therapy with Krysta Klobosits since September 2022. She did not, however, present any evidence confirming this therapeutic relationship and Ms. Klobosits did not respond to Dr. Otto's efforts to speak with her.

**Custody Factor 16: Any other relevant factor.**

Not applicable.

**B. Conclusion**

This is an extremely difficult and troubling child custody case that has involved ongoing acrimonious litigation for several years. In July 2020, Mother unilaterally removed C.T. from her home and terminated Father's custodial rights regarding Daughters. For the past three and one-half years, C.T. has lived with Father and has had no relationship with Mother, while Daughters have lived with Mother and have had no relationship with Father. Father has endeavored since

43

July 2020 to re-establish his relationship with Daughters. His efforts have been thwarted by Mother, who claims she is only doing what is necessary to protect Daughters from Father and C.T., and by Daughters' unwillingness to see Father. Mother seeks no custodial time with C.T. and is content with the status quo.

Both Dr. Esteve and Dr. Otto believed that this family was appropriate for reunification therapy, and the original plan—a solid one—was for all members to be involved in therapy prior to commencing reunification therapy. Father's ability to see and interact with Daughters was put on hold while Daughters worked through issues during therapy. Mother sabotaged the plan and let it be known that she has no intention of cooperating with reunification therapy. Therefore, other options must be explored.

Maintaining the status quo is not appropriate. The undisputed expert testimony is that the status quo will place the Children at high risk of significant issues in their adolescence and adult life. Nor is removing Daughters from Mother's custody and placing them with Father and appropriate option. While the Court finds that Mother has, in fact, alienated Daughters from Father as well as C.T., there is a significant risk of emotional harm to Daughters should they be abruptly uprooted from their current environment.

After carefully weighing the evidence in view of the prescribed custody factors, the Court concludes that it is in the best interest of the Children for the Parties to share legal custody of the Children; Father to exercise primary physical custody of C.T.; Mother to exercise supervised physical custody of C.T. and thereafter partial physical custody of C.T.; Mother to exercise

44

primary physical custody of Daughters; and Father to exercise supervised physical custody of Daughters and thereafter partial physical custody of Daughters.[26]

## III.  CONTEMPT

The contempt power is "essential to the preservation of the court's authority and prevents the administration of justice from falling into disrepute." Marian Shop, Inc. v. Baird, 670 A.2d 671, 673 (Pa. Super. 1996) (citation omitted). "To be in contempt, a party must have violated a court [o]rder, and the complaining party must satisfy that burden by a preponderance of the evidence." Hopkins v. Byes, 954 A.2d 654, 655 (Pa. Super. 2008) (citation omitted). The complainant must establish the following: "(1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent." P.H.D. v. R.R.D., 56 A.3d 702, 706 n. 7 (Pa. Super. 2012). The complaining party must establish the violation of a court order by a preponderance of the evidence. Sinaiko v. Sinaiko, 664 A.2d 1005-1009-10 (Pa. Super. 1995).

Should the complaining party establish that the alleged contemnor is in contempt, the Pennsylvania Domestic Relations Code permits the imposition of sanctions as follows:

> (1) A party who willfully fails to comply with any custody order may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:
>
> (i)    Imprisonment for a period of not more than six months.
>
> (ii)   A fine of not more than $500.
>
> (iii)  Probation for a period of not more than six months.
>
> (iv)   An order for nonrenewal, suspension or denial of operating privilege

---

[26] The Court is keenly aware of Mother's refusal to follow the previous custody orders, and there is certainly the risk that she will continue to refuse to do so. Should Mother refuse to follow the custody order entered contemporaneously herewith, the Court will consider removing Daughters from her custody.

under section 4355 (relating to denial or suspension of licenses).

(v)  Counsel fees and costs.

(2) An order committing an individual to jail under this section shall specify the condition which, when fulfilled, will result in the release of that individual.

23 Pa.C.S.A. § 5323(g).

### A. Petitions

#### 1. Mother's Petition filed June 3, 2020, and Amended Petition filed July 16, 2020

On June 3, 2020, Mother filed a Petition for Contempt. Mother alleged that Father violated the existing Order by failing to comply with the custodial schedule; failing to take the Children to their extracurricular activities; using the Children as an intermediary to contact Mother; refusing to permit the Children to contact Mother; and encouraging the Children to conceal a cell phone from Mother. On July 16, 2020, Mother filed an Amended Petition for Contempt alleging that Father intentionally came into close contact with the Children and Mother without informing them that he was infected with COVID-19.

Mother established that Father failed to comply with the custodial schedule, failed to take the Children to their extracurricular activities, used the Children as an intermediary to contact Mother, refused to permit the Children to contact Mother, and encouraged the Children to conceal a cell phone from Mother. Mother did not establish that Father failed to notify Mother that he tested positive for COVID-19.

Therefore, Mother's Petition for Contempt, filed June 3, 2020, will be sustained, and Mother's Amended Petition for Contempt, filed July 16, 2020, will be overruled.

#### 2. Father's Counterclaim filed July 28, 2020

On July 28, 2020, Father filed an Answer and Counterclaim for Contempt. Father alleged that Mother refused to permit Father to exercise custody of Daughters (related thereto is Father's

46

claim that Mother was alienating the Children from Father and using Father's past diagnosis of COVID-19 as a basis to prevent Father from having contact with Daughters); and that Mother and her paramour abused C.T.

Father established that Mother prohibited Father from exercising his custodial rights under the existing Order, but did not establish that Mother and paramour abused C.T. Therefore, Father's Counterclaim for Contempt, filed July 28, 2020, will be sustained in part and denied in part.

### 3. Father's Petition filed August 27, 2020

Father filed a Counterclaim for Contempt on August 27, 2020. Father alleged that Mother violated the existing Order by refusing to permit Father to exercise custody of Daughters, refusing to permit C.T. to obtain his personal belongings from her residence, and making unilateral decisions regarding Daughters.

Father established that Mother prohibited Father from exercising his custodial rights under the existing Order and made unilateral decisions regarding Daughters, but did not establish that Mother refused to permit C.T. to obtain his personal belongings from her residence. Therefore, Father's Petition for Contempt, filed August 27, 2020, will be sustained in part and overruled in part.

### 4. Father's Petition filed January 6, 2021

On January 6, 2021, Father filed a Petition for Contempt. Father alleged that Mother violated the December 21, 2020, Order by refusing to permit Father to exercise custody of Daughters. Father established that Mother prohibited Father from exercising his custodial rights under the existing Order. Therefore, Father's Petition for Contempt, filed January 6, 2021, will be sustained.

47

### 5. Mother's Petition filed January 13, 2023

On January 13, 2023, Mother filed a Petition for Contempt. Mother alleged that Father violated the December 20, 2021, Order by failing to participate in therapy, failing to inform her that C.T. was no longer attending therapy, and disparaging Mother in his communication with her.

Mother established that although Father initially had trouble finding a therapist for C.T. and was working with Otto Psychological Associates to find a solution, Father failed to notify Mother of this development. Mother did not establish that Father disparaged her during their communications. Therefore, Mother's Petition for Contempt, filed January 13, 2023, will be sustained in part and overruled in part.

### 6. Father's Counterclaim filed March 1, 2023

Father filed an Answer and Counterclaim for Contempt on March 1, 2023. Father alleged that Mother violated the December 30, 2021, Order by putting Daughters on medication without Father's consent, travelling with Daughters without informing Father, failing to notify Father that Daughters were involved in an automobile accident, and permitting Mother's paramour to participate in medical decisions for Daughters.

While Father may have access to the medical portal, Mother is required to provide Father with medical information regarding Daughters. She failed to do so. Mother also failed to obtain Father's consent before travelling with Daughters and failed to notify Father about the automobile accident. However, Father did not establish that Daughters were taking medication or that Mother's paramour participated in medical decisions regarding Daughters. Therefore, Father's Counterclaim for Contempt, filed March 1, 2023, will be sustained in part and denied in part.

48

### 7. Father's Petition filed October 27, 2023

On October 27, 2023, Father filed a Petition for Contempt. Father alleged that Mother violated the December 30, 2021, Order by terminating Daughters' participation in individual therapy and refusing to participate in co-parenting counseling. Father established that Mother terminated Daughter's individual therapy and refused to participate in co-parent counseling. Therefore, Father's Petition for Contempt, filed October 27, 2023, will be sustained.

### B. Sanctions

Regarding Mother's Petition for Contempt, filed June 3, 2020, Father is adjudged in contempt and shall pay a fine of $250.00 to the Lehigh County Clerk of Judicial Records, Civil Division, within 60 days of the entry of the Custody Order.

Regarding Mother's Petition for Contempt, filed January 13, 2023, Father is adjudged in contempt and shall pay a fine of $250.00 to the Lehigh County Clerk of Judicial Records, Civil Division, within 60 days of the entry of the Custody Order.

Father's Counterclaim for Contempt, filed July 28, 2020, Father's Petition for Contempt, filed August 27, 2020, Father's Petition for Contempt, filed January 6, 2021, Father's Counterclaim for Contempt, filed March 1, 2023, and Father's Petition for Contempt, filed October 27, 2023, all arise from and are related to Mother's unilateral termination of Father's custodial rights regarding Daughters, Mother's ongoing refusal to permit Father to see Daughters, Mother's refusal to participate in co-parent counseling, and Mother's refusal to cooperate with reunification therapy. Mother's conduct, as detailed above in full, constituted an egregious interference on her part with Father's custodial rights. Therefore, Mother is adjudged in contempt and shall pay Father $20,000.00 in attorney's fees within 180 days of the entry of the Custody Order.

### END OF MEMORANDUM OPINION

49

BY THE COURT:

Date: January 26, 2024

_____
Thomas M. Caffrey, J.